**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

JENELL M. QUEE,

          Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

          Defendant.

No. C05-4041-MWB

**REPORT AND RECOMMENDATION**

_____

### *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    *PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . **2**

    *A.*     *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*     *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*     *Introductory facts and Quee's hearing testimony* . . . . . . . . . . **3**
        *2.*     *Quee's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
            *a.*     *Shoulders* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
            *b.*     *Eyes*     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
            *c.*     *Diabetes and other medical problems* . . . . . . . . . . . **14**
            *d.*     *Depression* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
            *e.*     *Consultative evaluations* . . . . . . . . . . . . . . . . . . **21**
        *3.*     *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . **23**
        *4.*     *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

*III.*   *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
       THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . **27**

    *A.*     *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **27**
    *B.*     *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **30**

*IV.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

*V.*    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

# I.  INTRODUCTION

The plaintiff Jenell M. Quee ("Quee") appeals a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits.  Quee claims the ALJ erred in failing to consider her ability to work during a thirteen-month period when she was undergoing and recuperating from surgeries, and in failing to pose proper hypothetical questions to the Vocational Expert.  (*See* Doc. No. 7)

# II.  PROCEDURAL AND FACTUAL BACKGROUND
## A.  Procedural Background

On July 18, 2002, Quee filed applications for DI and SSI benefits, alleging a disability onset date of June 19, 2002.  (R. 47-49, 303-05)  Quee alleged she was disabled due to ligament, tendon, and muscle damage to her arm and shoulder; "48% kidney function/operation"; diabetes, with complications including blindness in her left eye and retinopathy in her right eye; high blood pressure; high cholesterol; "low oxygen levels"; and decreased leg strength and circulation.  (R. 58)  She alleged her condition limited her ability to work because she could not use her arms or hands, stand, walk, or see.  (*Id.*)  Her applications and requests for reconsideration were denied.  (R. 29-39, 306-16)

Quee requested a hearing (*see* R. 40-41), and a hearing was held before ALJ Robert Maxwell on April 20, 2004, in Spencer, Iowa.  (R. 318-72)  Quee was represented at the hearing by attorney David A. Scott.  Quee testified at the hearing, and Vocational Expert ("VE") William Tucker also testified.

On August 31, 2004, the ALJ ruled Quee was not entitled to benefits.  (R. 11-20)  Quee appealed the ALJ's ruling, and on February 8, 2005, the Appeals Council denied Quee's request for review (R. 5-8), making the ALJ's decision the final decision of the Commissioner.

Quee filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Quee's claim. Quee filed a brief supporting her claim on July 6, 2005. (Doc. No. 7) The Commissioner filed a responsive brief on August 9, 2005. (Doc. No. 8) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Quee's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Quee's hearing testimony

At the time of the hearing, Quee was fifty-one years old. She was 5'7" tall and weighed 245 pounds. She was living in Fostoria, Iowa. She had a driver's license, and drove herself to the hearing. (R. 321-22, 353)

Quee graduated from high school, and then attended cosmetology school and received a cosmetologist's license, although she apparently never worked as a cosmetologist. At the time of the hearing, she was working part-time five to six days per week at Hardee's in Spencer, Iowa. Her job involved taking and filling orders at the drive-through window. According to Quee, her doctor had restricted her to working no more than twenty-five to thirty hours per week. She stated the doctor had given her a ten-pound lifting restriction due to lack of strength and mobility in her right arm. (R. 322-23)

Quee stated she takes about fifteen different medications, some of which make her very tired. She is able to stay awake at work because she is "on the go all the time," but when she gets home, she usually goes to sleep or spends time watching television. She fixes her own meals, but stated she does not "eat right," and she eats at irregular times. (R. 324-25) Quee reviewed the exhibit listing her medications (*see* R. 99) and noted certain changes. (R. 326-28) According to Quee, she is unable to control her diabetes

with medication.  She stated her blood sugars had been running over 200, which she stated was "way too high."  (R. 328)  In addition, she stated she occasionally "bottom[s] out, which means going below 65."  (*Id.*)  She indicated her doctors were considering changing her to a different type of insulin in an attempt to control her blood sugar.  (*Id.*)

Quee stated she has problems with fluid retention.  According to Quee, her doctors have opined the medication she takes for fluid retention could be causing some of her kidney problems.  (R. 328-29)  Quee stated her doctors have indicated she may have to have dialysis or a kidney replacement at some point in the future.  (R. 329)

Quee stated she had surgery on her left shoulder in 2000, in Iowa City.  She recovered well, although she stated her shoulder "is not completely back to normal" and "never will be."  (R. 329-30)  At the time of her surgery, Quee was working forty hours per week at Hardee's.  She then had surgery on her right shoulder, on February 19, 2002, again in Iowa City.  According to Quee, doctors removed "several centimeters of calcium" from her shoulder.  She was doing "pretty good" after the surgery, and expected to make a full recovery.  She returned to work briefly, working for a total of about six hours during the week of March 7-13, 2002.  By March 21-27, 2002, she was back to working about thirty hours per week.  However, her shoulder continued to hurt through the late spring and summer.  She continued to work because she "figured it was just the shoulder healing[.]"  (R. 330-32)

Quee stated her shoulder continued to get sore, and an ultrasound revealed "a thickened tendon."  (R. 333)  She underwent a second surgery, and according to Quee, doctors "found the thickened tendon, but underneath the thickened tendon they found a torn rotator cuff and a torn muscle."  (*Id.*)  Following the surgery, she was immobilized in a sling.  She tried to return to work after several months because she had no income.  She stated Hardee's allowed her to "go back to doing paperwork," which Quee found difficult because she is right-handed.  She only worked for about three weeks doing paperwork.  Quee returned to Iowa City in July or August 2002, and talked with a physical

therapist about whether she could return to work. According to Quee, the physical therapist stated that because Quee was able to carry her own lunch tray, she should be able to return to work and put food in a sack and hand it to the customers, as long as she did not lift anything or do anything with her right arm. (R. 333-34) Quee returned to Hardee's and worked about three hours the first week, seven hours the second week, nine hours the third week, twelve hours the fourth week, fifteen hours the fifth and sixth weeks, eighteen hours the seventh week, nine hours the eighth and ninth weeks, eleven hours the tenth week, and then she was completely off work again for about two months.[1] (R. 334-35; *see* R. 337-38)

In late October 2002, Quee fell on a step and landed on her right shoulder. (*See* R. 177) She was unable to do her physical therapy exercises at home, and in January 2003, she underwent arthroscopic surgery to determine why she was unable to lift her arm. (R. 338-39; *see* R. 163-67) According to Quee, the doctor inserted the scope and "swore in the operating room" because Quee's rotator cuff had torn again. (R. 339) The doctor then performed revision rotator cuff repair. (*See* R. 164) Following the surgery, Quee was put in an immobilizing sling. She stated she could not dress herself or do anything with her arm while she was wearing the sling. (R. 339)

Quee stated her shoulder pain had been constant since even before the first surgery. She stated she took Tylenol with Codeine and slept a lot. The shoulder pain made her back and neck hurt, as well. Quee saw her doctor in Iowa City for follow-up on May 13, 2003, and told him she wanted to return to work. According to Quee, the doctor stated she could return to work, but her arm range of motion would be limited and she would have to work limited hours. Quee stated her employer was not immediately receptive to allowing her to work restricted hours and duties. After obtaining a written release for limited work

---

[1]*See* R. 101-04 for a week-by-week listing of the actual hours Quee worked and amounts she was paid from 01/03/02 to 02/18/04. Quee stated the summary was prepared by the payroll clerk at Hardee's. (R. 336) On the summary, "store" means Quee was working at the Hardee's store, and "cater" means she was assisting at a catering job off-site. (R. 336-37)

from her doctor, Quee returned to work for six to eight hours a week beginning May 29, 2003. (R. 340-41) By July 2003, Quee was working about twenty-six hours a week, and she has remained at about that level of work. (R. 341) It was Quee's understanding that her work restrictions included limited hours, no lifting over ten pounds with her right arm, and no reaching above chest level with her right arm. (R. 344) The ALJ noted a copy of the work restriction form was not in the records provided by Quee's doctor, and the ALJ indicated he would consider that form to be "fairly significant evidence." (R. 344)

The court notes the record contains several work restrictions forms dating from March 8, 2002, through May 13, 2003. (R. 292-301) The form completed by R. Kumar Kadiyala, M.D. on May 13, 2003, indicates Quee was released to work twenty-five to thirty hours "light duty," with the following restrictions: lift, push, or pull up to ten pounds occasionally (1-3 hrs/day); unlimited bending, twisting, squatting, climbing, standing/ walking, sitting, driving, and use of feet. With her right hand/arm, frequent (4-6 hours) grasping, reaching out, fine manipulation, and reaching above her waist, but no reaching above shoulder height or reaching "to waist"; and no restrictions on use of her left hand/arm. (R. 292)

Quee stated she has very little vision in her left eye. She can detect light, but cannot see movement or make out shapes. She had two surgeries on her left eye, but doctors were unsuccessful in saving her vision. In her right eye, Quee stated she has diabetic retinopathy, and her visual acuity is about 20/30 or 20/35, without corrective lenses. She wears reading glasses to read, and has safety glasses she is "supposed to be wearing" but does not wear. (R. 347-49) She has a restriction on her driver's license requiring her to have a left-hand mirror on her vehicle. (R. 349)

Quee stated her diabetes also causes her to have neuropathy in her feet, which results in sensitivity in her feet and loss of feeling in her big toe. She stated she wears "special shoes with special inserts" because her "arches have both collapsed." (R. 349-50)

She stated she receives all of her medical treatment at the University of Iowa Hospitals and Clinics because she cannot afford to see other doctors. (R. 350)

Quee estimated her 2003 income at about $6,000, and her 2002 income at about $2,000. She stated there had not been any material change in the number of hours she had worked during 2004. She considered her job to be in good standing at Hardee's, and stated her employer was happy with her performance "[m]ost of the time." (R. 351) She stated her employer does not make any special accommodations for her. She is able to take orders, make change, and hand customers their sacks and drinks. (R. 357-58)

Quee stated she had gained weight during the previous year. She had tried dieting and walking, but she was unable to walk because of her foot condition. She noted one of her doctors had told her to walk thirty to sixty minutes a day, and felt she "just . . . was fat," but Quee quit seeing him because she felt he was not trying to help her. She has not tried any alternative exercise programs other than her attempt at walking. (R. 352-53) She did physical therapy at home for her right shoulder, but she no longer does those exercises. According to Quee, doctors have told her most of her health complications are due to her body weight. She is not on a diabetic diet. Quee stated she is allergic to NutraSweet, which makes controlling her diet difficult. However, she has seen a nutritionist and has been counseled about her diet. (R. 353-55)

Quee said that of her medical problems, her feet cause her the most problem with working. She got some special shoes in January 2004, and according to Quee, her doctor stated it would take some time for her feet to heal. (R. 354-57) She stated her "arches had completely collapsed on one [foot] and there was calcium in the blood vessels and the other [arch] was starting to collapse." (R. 357) She stated she could walk with her special shoes, and her feet were improving.

Quee stated she does all her own housework, and she likes to go shopping, which involves walking. She stated shopping is "a lot of [her] exercise." (R. 358) She watches a lot of television, and she sees family occasionally. (*Id.*)

Quee stated she could not be on her feet working for more than six hours in a day. She stated she has problems sitting because her back and legs will go numb, and she estimated she could sit for no more than two hours in an eight-hour day. According to Quee, she has a twenty-pound lifting restriction which is ongoing and permanent. She can bend over and touch her toes, with some difficulty. She can go up and down stairs, but stated she was "not supposed to right at the moment" until her feet healed. (R. 359-60) She stated she cannot bend her knees very well. She has no limitations on use of her hands. She can raise her right arm above her head, but cannot lift anything with her right arm at that level. She can reach with her left arm without difficulty. She stated she can pick up something that weighs ten pounds if she uses both hands. She can pick up a gallon of milk with her right hand, but it is uncomfortable to do so. (R. 360-61, 363)

Quee stated she has no income other than her Hardee's job. Her family does not assist her. She got food stamps for awhile, but they were terminated when she failed to send in paperwork. She planned to reapply for food stamps. (R. 361-62)

Quee stated she probably could work as a cashier for forty hours a week if she did not have to stand for more than five or six hours and she had a chance to sit down occasionally. (R. 364)

**2.      *Quee's medical history***

**a.      *Shoulders***

Quee apparently underwent left shoulder surgery on March 1, 2000. She was scheduled to be off work for two weeks, and then on light duty for approximately two weeks, with limited lifting using her left arm. (R. 302)

In July 2001, Quee fell on some steel risers at a graduation ceremony and landed on her right shoulder. She tried physical therapy, exercise, and nonsteroidal medications, without any significant relief. She took a few days off work immediately after the injury, but then went back to work. She received a cortisone injection on December 4, 2001.

(R. 142-46, 107, 237)  R. Kumar Kadiyala, M.D. diagnosed Quee with right acromio-clavicular joint arthropathy, and on February 21, 2002, Quee underwent right distal clavicle resection.  Her shoulder discomfort improved, and on March 8, 2002, she was released for light-duty, part-time work, with no repetitive activities, and no significant lifting, pushing, or pulling activity with her right arm.  (R. 227-36, 301)

Seven weeks after her surgery, Quee was referred to a physical therapist for range of motion and strengthening.  Quee complained of pain and a numb or tingling feeling in her upper arm.  She stated she did not want to be examined because it would hurt too much; she only wanted to be taught some exercises.  (R. 217)  Notes indicate Quee's scar was well healed, though she exhibited tenderness over the surgical site.  Quee held her right arm close to her body, and had a limited range of motion, stating motion was painful.  "She was instructed in several exercises and encouraged to use a cold pack for pain relief." (*Id.*)  Her work restrictions remained unchanged.  (R. 300)

On May 8, 2002, Quee saw Dr. Kadiyala for follow-up and review of a recent MRI.  She complained of moderate pain, and indicated she had not changed her work or home activities at all since her last visit.  She stated she was feeling worse, and ongoing trouble with her original shoulder problem had prevented her from returning to her usual activities full-time.  The MRI indicated "thickened supraspinatus tendon insertion," which the doctor opined was "most likely intrasubstance tendinopathy."  (R. 215)  He recommended Quee undergo "arthroscopy of the shoulder and possible debridement of the infraspinatus tendon insertion."  (*Id.*)

Dr. Kadiyala performed the procedure on June 20, 2002, on an outpatient basis.  Quee was sent home with a shoulder immobilizer/sling, which she was instructed to wear at all times except when performing exercises.  She was given exercises to do at home at least three times daily.  (R. 210)  Quee saw a physical therapist two-and-a-half weeks following her surgery.  She was still wearing the immobilizer/sling.  Notes indicate she was working as a biscuit maker at Hardee's, but was "off work until Sept."  (R. 208)

Quee exhibited pain on very limited range of motion. The physical therapist instructed Quee in additional exercises to do at home, and encouraged her to keep her elbow straight when she was out of the sling three times a day. Quee called one week later, on July 18, 2002, to report she had "developed severe pain" and felt like her arm was "locked." (*Id.*) She stated she had "taken 3 Darvocet and 2 muscle relaxors [sic] without relief." (*Id.*) The physical therapist contacted Dr. Kadiyala's office to schedule an appointment for Quee. (*Id.*)

Quee saw Dr. Kadiyala on August 6, 2002 for routine follow-up. She still exhibited decreased range of motion. X-rays were negative for new abnormalities. (R. 201) She was instructed in additional home exercises, and "was advised against any resistive type activity with right shoulder." (R. 199) She also was told to use cold packs as needed. (*Id.*)

When Quee returned to see Dr. Kadiyala on August 27, 2002, she continued to complain of persistent pain about her shoulder. She had been taking Neurontin for pain, and was doing some light desk duty at work. The doctor wanted to treat Quee with physical therapy, but Quee's payor apparently would not cover regular outpatient physical therapy, so the doctor had Quee admitted to "Boyd Tower" for three to five days of physical therapy. (R. 193)

Quee was in Boyd Tower for physical therapy from August 27, 2002, to September 3, 2002. (R. 188-92) She made some progress during her stay; however, the therapist noted Quee likely would not "continue to progress without local therapy – which [was] apparently not an option with her payors." (R. 188) She was instructed in additional home exercises, and told to use heat/ice as needed for pain. (*Id.*) Quee was released to return to work on September 2, 2002, with restrictions of doing "desk type of working 5-10 hours per week <u>or</u> one handed work with [left] arm." (R. 296)

On Wednesday, October 23, 2002, Quee called Dr. Kadiyala to report that she had fallen off a step the previous Friday, and landed partially on her shoulder. On Sunday, she

had begun having increased pain in her shoulder and she was having difficulty doing some of her exercises. The doctor advised her to "back off her exercise some, but continue to do gentle [range of motion], ice shoulder 15 min. several times a day," and take Darvocet as needed. (R. 177) Notes indicate Quee had further surgery scheduled for December 12, 2002, and the doctor requested additional x-rays of Quee's shoulder prior to that time. (*Id.*) Quee's shoulder was x-rayed on November 19, 2002, and the films showed no new abnormalities. (R. 176)

Quee's surgery apparently was rescheduled, and Dr. Kadiyala saw Quee on January 8, 2003, for a preoperative workup. Quee complained of ongoing pain in her shoulder. She had continued to take Neurontin for pain, and to do only light desk duty at work. Her previous incision was well healed. The doctor planned to "[p]roceed with arthroscopic evaluation, and hopefully release of adhesions." (R. 167-68) He performed the procedure on January 9, 2003, and found Quee had re-torn her supraspinatus tendon. He also noted "[s]ignificant subacromial bursitis." (R. 165) Following surgery, Quee was instructed in several passive range-of-motion exercises to begin immediately, and was told to return for follow-up in four to six weeks. (R. 165) Dr. Kadiyala directed Quee to remain off work until her post-operative evaluation scheduled for January 28, 2003. (R. 295)

Quee saw a physical therapist daily from January 11-17, 2003, for post-operative therapy. (R. 160-63) Quee put forth good effort in physical therapy, but exhibited considerable tightness when stretching her shoulder in external rotation. She skipped her exercises one day, and exhibited some loss in range of motion. The physical therapist reminded Quee of the importance of doing her exercises three to five times daily. (R. 161)

Quee saw Dr. Kadiyala on January 28, 2003, for follow-up. He directed her to remain off work for another two months, and noted he would reassess Quee's work status at her monthly follow-up visits. (R. 294)

Quee was seen in the Family Care Center on February 12, 2003, for follow-up of multiple medical problems. At that time, her right shoulder was splinted in a sling, and she complained of intermittent right shoulder pain as well as low back pain. She was taking Tylenol #3 with codeine for pain,. (R. 153)

Quee next saw Dr. Kadiyala on February 25, 2003. She stated she had been doing her exercises and wearing the sling, and her pain had decreased greatly, although she still had some discomfort after doing her exercises. She continued taking Neurontin as needed for pain. The doctor ordered physical therapy to add pulley exercises to Quee's routine, as well as isometrics and supine overhead exercises. She was directed to return for follow-up in one month. (R. 148-50)

Quee saw a physical therapist for follow-up on March 25, 2003, and reported her pain had continued to improve. Her incisions were well healed. She had some stiffness, which the therapist intended to address with general strengthening and range of motion exercises. She was directed to return in six weeks. (R. 289) On the same date, Dr. Kadiyala released Quee to return to work with the following restrictions: only occasional lifting of one to five pounds, and only occasional use of her right hand for grasping, push/pull, reaching out, fine manipulation, or reaching above the waist. (R. 293)

Quee returned to see Dr. Kadiyala and the physical therapist for follow-up on May 13, 2003, seeking a work release. Notes indicate health problems unrelated to Quee's shoulder had prevented her from engaging in her usual activities full-time. (R. 287) Quee was released to work twenty-five to thirty hours per week on light duty, with the following restrictions: occasional lifting up to ten pounds, and no lifting over ten pounds; no restrictions on bending, twisting, squatting, climbing, standing/walking, sitting, driving, and using her feet; occasional pushing/pulling with her right hand; frequent (4-6 hours) grasping, reaching out, fine manipulation, and reaching above the waist with her right hand/arm; and no restrictions on use of her left hand/arm. (R. 292)

Quee saw Dr. Kadiyala for follow-up on September 23, 2003. He noted Quee had never regained full range of motion following her second surgery. Quee reported that she had tripped getting out of her van on August 18, 2003, falling on her right hand and dislocating a finger. She was concerned the fall might have affected her right shoulder. The doctor examined Quee and determined her shoulder remained stable. (R. 278)

### b.    Eyes

On May 31, 2000, Quee requested a stool softener from her family doctor "due to inability to 'push' because of recent eye surgery." (R. 107) There are no records in the transcript regarding the nature of the previous eye surgery, although records from a cerebrovascular evaluation on May 9, 2001, indicate Quee had a history of diabetic retinopathy. (*See* R. 241)

By December 15, 2001, Quee had lost almost all light sensation in her left eye. She also had reduced vision in her right eye, and she underwent panretinal photocoagulation (PRP) in her right eye on that date, and again on February 27, 2002. (R. 234-36, 228-30) She had some fill-in PRP on April 10, 2002, after reporting continued vision problems in her right eye. (R. 220-22)

Although the record contains notes indicating Quee had scheduled an appointment with an eye specialist in Iowa City for April 30 or May 2, 2002, the record contains no evidence of such an appointment. (*See* R. 106, 212)

In a letter to Disability Determination Services dated October 1, 2002, Quee's doctor noted Quee had light perception in her left eye, and "a mildly constricted visual field" in her right eye. With correction, her vision in her right eye was 20/25, which the doctor stated was "almost normal vision." He noted Quee might require further laser treatment on her right eye "shortly." (R. 108)

Quee reported "doing well" on November 20, 2002 (R. 174). On January 16, 2003, Quee reported that she had not been able to use her eye drops since undergoing shoulder surgery the previous week, and she thought her vision had decreased somewhat

since the surgery. The doctor noted Quee's blood sugars had been high since her surgery. She was directed to return in two months, with a plan to do additional laser treatment at that time. (R. 157-58) There is no further medical evidence of record concerning Quee's eye problems other than ongoing notations, at her routine follow-up visits for her medical management, that she carried a diagnosis of diabetic retinopathy.

### c. *Diabetes and other medical problems*

The record indicates that on May 1, 2002, in addition to her shoulder problems described above, Quee was receiving ongoing medical management for diabetes mellitus type 2 "under less than optimal control"; hyperlipidemia, chronic renal insufficiency, hypothyroidism, diabetic retinopathy, and depression. (R. 212-13) She was taking the following medications: Acetaminophen (an over-the-counter analgesic); Alprazolam (used to treat generalized anxiety disorder); Aquaphilic topically (ointment used to treat dry skin); Enteric-coated aspirin; Atorvastatin (a lipid-lowering agent, used in treatment of diabetes to reduce risk of heart attack and stroke); Benazepril 40 (used to treat hypertension); Darvocet-N, up to twice daily as needed (a pain reliever); Docusate (an over-the-counter laxative); Folic acid; Furosemide (a diuretic); Amaryl (an anti-diabetic agent); NPH insulin, night and morning; Levothyroxine (used to treat hypothyroidism); Multivitamin; Nefazodone (an antidepressant); and Micro-K (a potassium replacement agent). (R. 212; *see* www.rxlist.com for medication descriptions)

Quee also had a long history of constipation and abdominal pain, which doctors noted could be exacerbated by her medications, and the fact that Quee did not drink enough fluids. (R. 106)

Quee's advanced renal insufficiency was managed by doctors at the Department of Internal Medicine in Iowa City. At an evaluation on July 19, 2002, doctors noted Quee's renal insufficiency was relatively stable, and likely was "related to a combination of atherosclerosis and diabetes mellitus." (R. 205) Her blood pressure was reasonably controlled. Doctors planned to refer Quee to the Renal Transplant Service for education.

However, Quee stated "she would elect to forego dialysis even in the presence of renal failure." (R. 206)

In July 2002, to try to get Quee's diabetes under better control, doctors switched her from NPH insulin to 70/30, and discontinued Amaryl due to possible effects on Quee's renal insufficiency. They had Quee talk with a diabetes nurse educator, and set up a schedule for Quee to report her blood sugars. They also had Quee talk with a dietitian about her diet. Doctors noted Quee was suffering "significant complications" from her diabetes, but they expected to be able to improve her control and stop the progression of her complications. (R. 202-03)

Quee's blood sugar levels continued to be uncontrolled. On August 28, 2002, she reported her blood sugar was over 400. According to Quee, "her uncontrolled blood glucose level [could] be due to an improper diet as she [drank] a lot of soda." (R. 185) She was restarted on Amaryl, with a gradually-increasing dosage. Her renal insufficiency appeared to be stable. She was scheduled for follow-up in four weeks. (R. 185-86)

At her next follow-up on September 25, 2002, Quee's diabetes was still assessed as uncontrolled. Her blood sugars were averaging from the 100s to the 300s. She reported doing some binge eating, and she was encouraged "to avoid eating grapes and too much sugar containing foods." (R. 178, 184) Notes indicate Quee had "decided against transplant and dialysis that was set up for her and she did not keep the appointment because of worsening serum creatinine." (R. 178) She complained of some tingling in her feet, and continued problems with constipation. The endocrinology clinic continued Quee's current Amaryl and insulin dosages, and noted Quee was somewhat caught between different doctors in different departments, recommending different treatments. The endocrinologist deferred to the Diabetes Clinic and Family Care Center doctors with regard to management of Quee's diabetes, and scheduled her for follow-up in six weeks. (R. 178-79, 183-84)

Quee was seen in the Family Care Center on November 20, 2002, for general follow-up, and also for complaints of an "aching pain in her right ear with some dysequilibrium." (R. 172) Her blood sugars were under better control, ranging between 110 and 130 in the morning, but rising up to 250 in the afternoon. She stated she was trying to avoid sugar-containing foods, but she was not doing any exercise activities. She noted she was scheduled for shoulder surgery in a month. Quee's medications remained unchanged. She was encouraged to walk every day. Notes indicate her dysequilibrium likely was a side effect of her many medications, coupled with her diabetes and anxiety. Her earache apparently was due to a buildup of ear wax, which was removed. She was scheduled for follow-up in three months. (R. 172-73)

On November 21, 2002, Quee was seen in the Renal Hypertension Clinic for follow-up of her diabetic nephropathy with progressive renal disease. Quee reported having "frequent dizzy spells with light-headedness and some vertiginous sense over the last week," which symptoms appeared "to have resolved spontaneously." (R. 170) She also reported light-headedness with standing and bending. Doctors opined Quee had "advanced renal insufficiency as a result of diabetic nephropathy." (*Id.*) She was encouraged to keep her blood sugars and blood pressure under control. Her medications were adjusted somewhat. (*Id.*)

Quee underwent an x-ray of her lumbar spine on December 31, 2002, to evaluate complaints of musculoskeletal low back pain. The x-ray showed "[d]egenerative disease of the thoracolumbar and lumbar spine," without "acute compression deformities or malalignment." (R. 137-41)

Quee was seen in the Family Care Center on February 12, 2003, for follow-up of her multiple medical problems. (R. 153-56) She was taking Tylenol #3 with codeine for pain following her shoulder surgery, and the medication was worsening Quee's constipation, which she had been having for almost a month. She had tried several types of laxatives, but had responded only to an enema. She also complained of hemorrhoidal

pain, and of a skin rash on her lower abdomen. Quee's diabetes was under much better control since her last visit. She was continued on the same insulin dosage. Quee was encouraged to exercise as much as possible. She also was encouraged to drink more fluids for her chronic renal insufficiency. Her skin rash was diagnosed as a candidal infection, and she was prescribed an ointment. She was referred for surgical consultation regarding her hemorrhoids. Her blood pressure was under much better control than previously, and her blood pressure medications were continued unchanged. Doctors planned to obtain further x-rays of Quee's back at her next follow-up visit in one month. (R. 154)

Quee was seen in the Renal Hypertension Clinic on February 13, 2003, for follow-up of her hypertension. During her examination, Quee complained of "increasing back pain radiating to the lower extremities causing leg weakness and discomfort and preventing standing or walking for prolonged period of time." (R. 151) She also complained of problems with constipation and obstipation since increasing her diuretics and analgesics following her shoulder surgery. Doctors noted Quee had some "modest anemia" following her surgery. They scheduled a reevaluation in three months, and ordered a renal ultrasound to occur in the interim. Her medications remained unchanged. (*Id.*) The ultrasound of Quee's kidneys was performed on February 25, 2003. Impressions from the ultrasound were "lower limits of normal sized kidneys with mildly elevated [resistive indices] bilaterally, consistent with bilateral medical renal disease"; and "no evidence of renal artery stenosis." (R. 290)

Quee was seen for follow-up of her multiple medical problems on April 23, 2003. She reported "no worsening of her medical problems" since her last visit. Her only new complaint was low back pain, which she stated had been increasing for awhile. She complained of back pain "with walking or doing any activity or standing and . . . improved with rest or taking analgesics and Tylenol #3." (R. 285) Her blood sugar was high, running in the 200s, and she had increased her insulin dosage. In addition, Quee felt she was gaining weight despite the fact that she was not eating much. Quee's kidney functions

had improved, and doctors planned to continue monitoring her kidney function closely. Her Amaryl dosage was increased. Doctors opined her low back pain was due to her obesity, and she was encouraged to ride a bike and walk for at least thirty to sixty minutes daily to help her lose weight. On examination, doctors noted Quee had decreased dorsalis pedis pulses. An ankle-brachial index was ordered to evaluate her peripheral circulation. (R. 25-86)

Quee returned for follow-up of her renal insufficiency and hypertension on April 24, 2003. Doctors noted her renal ultrasound and Doppler studies "revealed evidences of medical renal disease without findings of renal artery stenosis." (R. 282) Quee was "free of major uremic signs and symptoms and her urinalysis [was] remarkable for absence of heavy proteinuria." (*Id.*) Doctors stated Quee could be managed by her family doctor and did not need to return to the Nephrology Clinic for follow-up unless her condition worsened. (*Id.*)

On May 15, 2003, Quee underwent a colonoscopy for colon cancer screening. The study revealed right-sided diverticulosis and external hemorrhoids, but otherwise was a normal study. (R. 281)

At her next follow-up in the Family Care Center, on June 18, 2003, Quee complained of hip pain and low back pain, which she indicated was preventing her from doing even mild exercise such as walking. She stated she could walk two blocks easily, but walking any farther caused pain in her back and legs. Quee's condition was basically unchanged with regard to her other ongoing medical conditions. Doctors again opined her back and hip pain was due to obesity and lack of adequate exercise. They encouraged Quee to increase her exercise and try to lose weight. She also was encouraged to drink more fluids, and to check her blood sugar levels more often. (R. 279-80)

Quee's next follow-up exam was on September 25, 2003. Her blood sugar was under better control, with her levels running so low on occasion that she was slightly symptomatic. Quee complained of dry, itchy skin on the palms of her hands, and she had

a skin lesion on her right cheek. She also complained of leg cramps and hip pain, as well as some foot pain which she opined might be from new shoes. Because of Quee's low blood sugars in the morning, her evening dose of insulin was reduced. She was referred to a Diabetic Foot Nurse for evaluation and care of her foot problems. She was referred to Dermatology for evaluation and treatment of her skin problems. Her other medications remained unchanged. (R. 276-77)

On December 11, 2003, Quee was seen in the Orthopaedics department complaining of bilateral foot pain, worse on the left. She stated her foot numbness, tingling, and pain had increased recently. She was wearing shoe inserts prescribed by a chiropractor, which she stated had helped somewhat, but she was having marked difficult with shoe fitting. She stated she was working at Hardee's, and shoes that were appropriate for her work caused irritation of her toes on both feet. Examination revealed "a tendency for arch collapse and curling of her toes," as well as "marked fat pad atrophy underneath the metatarsal heads." (R. 270) X-rays were obtained of both feet and ankles, revealing "tendency to planus of her left foot," and "heavy vascular calcification of the small vessels in her foot." (*Id.*; *see* R. 271-72) Doctors recommended "a custom insert and accomodative [sic] shoes with rocker soles." (*Id.*)

The orthopedist who performed Quee's foot examination wrote a letter dated December 19, 2003, outlining his findings and confirming the medical necessity of Quee's wearing the custom insert and shoes. (R. 291)

Quee was seen in the Dermatology clinic on January 29, 2004, for evaluation of "a scaly red place on her right cheek that had been present for the past few months." (R. 267) Quee reported "picking at the lesion incessantly" and the lesion had resolved completely over the previous few weeks. Her dry, itchy palms had responded to the use of topical moisturizers. Quee reported "feeling well in general" and having "no other skin concerns." (R. 267) Quee was encouraged to use emollients liberally at least twice a day, especially after bathing and swimming. (*Id.*)

On October 20, 2004, Jose Ness, M.D., from the Family Care Center, Division of Internal Medicine, at the University of Iowa Hospitals and Clinics, wrote an opinion letter regarding Quee's ongoing medical condition. Dr. Ness noted he had been Quee's treating physician since September 25, 2003, and stated Quee suffered from chronic ailments including Diabetes mellitus type 2, hypertension, chronic renal insufficiency, peripheral neuropathy, severe chronic shoulder pain, and depression. (R. 317) He then offered the following opinion regarding Quee's ability to work:

> It is my belief that these conditions make Ms. Quee unable to undertake gainful employment for any reasonable length of time. Her diabetes requires intensive control with frequent blood sugar measurements. It has predisposed her to infections and to nerve damage in the form of neuropathy. Her neuropathy causes pain that is not yet fully controlled, and requires intensive and frequent management. Her shoulder pain is also an obstacle to further work. Her chronic renal failure may cause additional fatigue and difficulties with performance. Finally, she does have bouts of depression that compound her clinical picture.

(*Id.*)

### d. *Depression*

On August 28, 2002, Quee was referred for a psychiatric consultation because she was exhibiting signs of depression due to the deaths of some family members. She was started on antidepressant medications. The referring doctor expressed concerns that Quee's depression was affecting her ability to care for herself, and maintain her diabetic medication and diet regimens. The consulting physician switched Quee's antidepressant to Celexa, and directed her to return for follow-up in four weeks. (R. 194-98)

On September 25, 2002, Quee was seen for follow-up. She reported feeling better on 10 mg. of Celexa. She denied suicidal thoughts, and expressed a desire to be followed by her medical doctor instead of seeing a psychiatrist. She described numerous psychosocial stressors during the previous several years, including the deaths of her father,

mother, and only sibling, but she stated she had "very good support in several friends that she [saw] on a daily basis." (R. 180) She was diagnosed with Major Depressive Disorder, Recurrent, Moderate. Doctors agreed Quee's depression could be followed by her Internal Medicine doctor. (R. 180-81)

On February 12, 2003, Quee was seen in the Family Care Center for follow-up of her various problems, and she reported she was still taking Celexa. Doctors noted her mood "continue[d] to be adequate." (R. 154) From records of her ongoing medical management, it appears Quee has continued to take antidepressants. (*See, e.g.*, R. 99, a listing of Quee's current medications at the time of the hearing)

### e. *Consultative evaluations*

On October 21, 2002, Rhonda Lowell, Ph.D. reviewed the record and completed a Psychiatric Review Technique form. (R. 111-24) She found Quee's depressive disorder to be nonsevere, and opined Quee was "mentally capable of understanding and remembering instructions and procedures for basic and detailed tasks," with sufficient attention and concentration to carry out tasks at those levels. (R. 125) Dr. Lovell further opined Quee's "mental impairment would not significantly interfere with her ability to carry out a typical work week." (*Id.*)

On December 12, 2002, J.D. Wilson, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 126-33) He opined Quee could lift up to twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit, with normal breaks, for a total of six hours in an eight-hour workday; and push/pull without limitation. He further opined Quee would have occasional limitations with most postural activities and she should never climb ladders, ropes, or scaffolds. He found she should avoid cold and overhead reaching with her right arm, and he noted she had limited

vision in her *right* eye, but unlimited vision in her *left* eye.[2] Dr. Wilson found Quee to have medically-determinable impairments including "Type II diabetes mellitus with retinopathy [in the right eye], blindness [in the left eye], neuropathy, nephropathy with chronic renal insufficiency, right rotator cuff tendinitis, arthropathy, bursitis, s/p 2 surgeries, Level II obesity." (R. 134) He found Quee's impairments to be severe, but not reaching the Listing level of severity. Dr. Wilson found Quee had made inconsistent allegations regarding her limitations in forms she completed, noting she stated in one form that she was unable to walk or stand, and in another form that her abilities to walk/stand/sit were not affected by pain. (R. 135)

On April 1, 2003, M. Jane Bibber, Ph.D. reviewed the record and completed a Psychiatric Review Technique form for purposes of the reconsideration of Quee's disability claim. (R. 242-55) Dr. Bibber found Quee's major depressive disorder to be in remission on medications, and she opined Quee would have only mild restriction of the activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace. (R. 245, 252) In her review summary, Dr. Bibber noted Quee had not alleged that a mental impairment limited her ability to work. She found Quee's mental impairment not to be severe, and opined Quee possessed sufficient mental capability to understand and remember instructions and basic procedures for both basic and detailed tasks, and to maintain attention and concentration to carry out those tasks. She further opined Quee would be able to interact appropriately with supervisors, coworkers, and the public, and respond appropriately to changes in the workplace. (R. 256)

On April 4, 2003, John A. May, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 257-65) His assessment was

---

[2]The court notes these findings are reversed, as Quee has little to no vision in her *left* eye. This apparently was simply a scrivener's error in completing the form, as Dr. Wilson's review summary contains accurate information about Quee's visual acuity in each eye (*See* R. 134)

basically identical to the assessment of Dr. Wilson in December 2002. (*See* R. 126-35, and discussion *supra*)

### 3.    *Vocational expert's testimony*

VE William B. Tucker testified Quee has no acquired skills from her past work that would transfer readily to other semi-skilled or skilled, light or sedentary jobs. The VE also stated the fact that Quee had earned a cosmetology certificate would not add anything to his opinions because Quee had never worked in cosmetology. (R. 366)

The ALJ asked the VE to consider an individual over the age of 50, but not yet 55, with a high school education, literate in the English language, and with Quee's work history. Giving full weight to Quee's testimony regarding her medically-determinable impairments and their effect on her ability to work, the VE stated Quee would be able to work less than full-time, either at her past work or at other work. The VE based his opinion on Quee's testimony that she was limited to twenty-five to thirty hours of work per week; she spent much of her time at home sleeping; and she had described foot and back problems. (R. 266-67)

The ALJ then asked the VE the following hypothetical question:

> Hypothetical two is intended to ask you about the state agency assessment [at R. 257-66]. Age, education, and work experience [are] the same as before. This time assume a person could occasionally lift or carry 20 pounds, frequently ten pounds. Can stand or walk with normal breaks for about six hours of eight. Sitting with normal breaks for about six hours of eight. Push/pull would be unlimited. But I think it's fair to read into that, since exertional activities are at the light range, the push/pull should be limited to the light range exertionally, as well. Postural activities are all occasional, except balancing, which is frequent. And they did put a line through ladders, ropes, or scaffolds, which you have to assume means they don't want that taking place. . . . There's – there is - are manipulative limitations with the right, upper extremity . . . [w]hich you can assume, Dr. Tucker, is her dominant

> extremity. There's no limits that they have with the left, upper
> extremity. They do say that insofar as reaching, [Quee] is
> limited to no overhead reaching. And they give the reason.
> I don't know if that changes anything, but it's secondary to
> rotator cuff repair. The main thing for our questioning,
> though, is no overhead reaching with the dominant, upper
> extremity. There's no communicative or environmental limits.
> Ironically, they don't have anything for visual there. Just with
> this assessment – I'm going to come back to vision. But just
> with this assessment that's before you, would you expect a
> person to be able to do any of [Quee's] past jobs?

(R. 367-68)

The VE responded that the hypothetical individual "could do the work of the cashier
checker and the fast-food worker." (R. 368) He noted that although the work of a baker
is classified in the national economy as medium work, Quee described her work as light,
so the hypothetical individual should be able to perform the work of a baker as Quee
performed it. (*Id.*) The VE stated there would be no material reduction in job restrictions
for unskilled, light work. (*Id.*)

The ALJ then asked the following question:

> Now, we need to, I think, to account for the vision.
> Assume that the individual has no useful visual acuity from the
> left side. From the right side, the individual does have the
> visual acuity that would allow her to drive with a legal – with
> a driver's license, make change, deal with customers,
> operating a, you know, computer terminal, and that type of
> thing. Would you expect there to be any vocational impact on
> the kinds of jobs that she's done in the past?

(R. 268-69) The VE responded there would be no significant impact on the individual's
past work, and no significant impact on the full range of unskilled, light work. (R. 269)

24

## 4.    The ALJ's decision

The ALJ found Quee had "performed some substantial gainful activity after her alleged onset date of disability but this was part-time and . . . does not constitute substantial gainful activity." (R. 15) Thus, the ALJ found Quee had not engaged in substantial gainful activity at any time since her alleged disability onset date of June 19, 2002. (*Id.*)

The ALJ found Quee has the following medically-determinable, severe impairments: "severe rotator cuff tear, status post three surgeries[;] diabetes mellitus with neuropathy, retinopathy and chronic renal insufficiency; left-eye blindness, obesity, degenerative changes in the lumbar spine and non-severe depression[.]" (R. 19 ¶ 3; *see* R. 15) However, he concluded Quee's impairments, singly or in combination, do not equal an impairment listed in the regulations. (*Id.*)

The ALJ found Quee's statements regarding her "history of shoulder problems that reasonably limit[] her ability to lift and reach within the 'light' exertional range, with no overhead reaching," to be "generally supported by the medical records[.]" (R. 16) However, he found Quee's subjective allegations concerning her physical limitations and alleged disability to be inconsistent "with the medical records, treatment notes, physician statements or activities of daily living," and therefore not to be entirely credible. (*Id.*)

The ALJ did not give controlling weight to the work restrictions imposed by Dr. Kadiyala because the doctor did not "rule out all work permanently," and his restrictions were "not supported by treatment notes or a narrative." (R. 17) The ALJ adopted the DDS determination of Quee's residual functional capacity, which the ALJ found to be supported by the medical evidence of record, and "reasonable and consistent with [Quee's] current activities of daily living which include part-time work." (*Id.*) The DDS residual functional capacity assessment adopted by the ALJ concludes Quee has "the residual functional capacity to lift up to 10 pounds frequently and 20 pounds occasionally, to sit and stand/walk up to six hours each in an eight hour day with regular breaks; to

occasionally climb, stoop, kneel, crouch, or crawl but that she should avoid overhead reaching with the right upper extremity." (*Id.*) The ALJ noted that in reaching its assessment of Quee's residual functional capacity, the DDS had "noted x-rays showed degenerative changes in the lumbar spine, that additional shoulder surgery improved her pain, that her diabetes, hypertension and vision [were] considered stable." (*Id.*)

In reaching his conclusions regarding Quee's residual functional capacity, the ALJ recognized that Quee has some limitations and restrictions due to her medical conditions. The ALJ stated as follows:

> Claimant has some permanent shoulder restrictions and should clearly avoid overhead reaching with the right upper extremity or lifting more tha[n] 10 pounds frequently or 20 pounds occasionally. The undersigned recognizes she had some recovery periods where she was off work but it does not appear that her shoulder problems precluded the performance of her past work for a continuous period of not less than 12 months at any time since June 2002. Claimant's capacity for a limited range of light work is not found to be further reduced by her diabetes mellitus, kidney problems, obesity, back pain, vision problems or renal insufficiency as these impairments in combination have been considered and may contribute to the light residual functional capacity, but not further reduce it.

(R. 17-18)

The ALJ found Quee's depression to be "non-severe," with no more than "minimal or slight limitations on her ability to work." (R. 18) He accepted the DDS conclusions that Quee's "depression results in no more than mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace," and no history of "exacerbations of temper, [or] increases of symptoms or signs accompanied by a loss of adaptive functioning." (*Id.*)

The ALJ concluded Quee "retains the residual functional capacity to perform her past relevant work as a cashier/checker and fast-food worker and baker as she performed

the jobs." (*Id.*) He therefore concluded Quee was not disabled, and denied her claims for benefits. (*Id.*; R. 19)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353

F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, ___ F.3d ___, 2006 WL 8474 (8th Cir. Jan. 3, 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not

"reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only

discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Quee raises two objections to the ALJ's decision. First, Quee argues the ALJ "failed to consider or discuss how [she] could have worked during the thirteen (13) month period from 2002 to 2003 when she was undergoing and recuperating from multiple shoulder surgeries as well as making repeated trips to Iowa City in an attempt to control her diabetes and chronic renal insufficiency." (Doc. No. 7, p. 5) According to Quee, the record demonstrates she was capable of working only a few hours per week for over thirteen continuous months. (*Id.*)

Quee alleges she became disabled on June 19, 2002, which is the date she had a second surgery on her right shoulder. Following her surgery, Dr. Kadiyala directed Quee

to stay off work until September 2002. By September, Quee had made some progress with physical therapy, but she was still experiencing pain and limited ranges of motion. On September 2, 2002, the doctor released Quee to work five to ten hours per week, either at a desk job or doing one-handed work with her left arm only. Quee reinjured her shoulder on October 23, 2002, but she continued to work a few hours per week. Further surgery on her shoulder on January 9, 2003, revealed she had re-torn her supraspinatus tendon, and the doctor directed Quee to remain off work until her post-operative evaluation on January 28, 2003. At that time, he directed her to remain off work for another two months. She continued to receive physical therapy, and her pain improved gradually. On March 25, 2003, Dr. Kadiyala released Quee to return to work with restrictions of only occasional lifting of one to five pounds, and only occasional use of her right hand for grasping, push/pull, reaching out, fine manipulation, or reaching above the waist.

On May 13, 2003, Quee requested a final work release from Dr. Kadiyala and the physical therapist. The doctor released Quee to work twenty-five to thirty hours per week on light duty, with restrictions of occasional lifting up to ten pounds, no lifting over ten pounds, occasional pushing/pulling with her right hand; and frequent grasping, reaching out, fine manipulation, and reaching above the waist with her right hand/arm.

During this same period of time, Quee was seeing physicians in Iowa City for medical management of her diabetes, renal insufficiency, and other medical problems. She was in Iowa City for doctors' appointments on the following dates in 2002: June 20, July 10, July 11, August 6, August 20, August 27, August 28, September 25, September26, October 1, October 20, November 19, November 20, November 25, and December 31. In 2003, she was seen in Iowa City on January 9, January 11-17, February 12, February 17, February 25, March 25, April 23, April 30, May 13, May 15, June 22, September 23, September 25, and December 11. Thus, the record shows Quee missed work due to doctors' visits in 2002, one day in June, two days in July, four days in August, two days in September, two days in October, three days in November, and one

day in December. In 2003, she missed eight days in January, three days in February, one day in March, two days in April, two days in May, one day in June, two days in September, and one day in December.

The court agrees with Quee that the ALJ did not adequately consider Quee's ability to work during the period from June 19, 2002, through June 22, 2003, while she was both recovering from multiple shoulder surgeries and seeing doctors for ongoing medical management of her other serious medical conditions. The ALJ noted Quee had had "some recovery periods where she was off work," but he found Quee's shoulder problems had not "precluded the performance of her past work for a continuous period of not less than 12 months at any time since June 2002." (R. 17-18) However, the ALJ failed to consider whether Quee's shoulder problems, coupled with her other medical problems, prevented her from working for the period June 19, 2002, through June 22, 2003, which is a continuous period of not less than twelve months.

The court further finds the ALJ's statements regarding Quee's work performance to be inconsistent. The ALJ found Quee "has performed some substantial gainful activity after her alleged onset date of disability but this was part-time and . . . does not constitute substantial gainful activity." (R. 15) Either Quee performed substantial gainful activity or she did not. The court finds Quee's part-time work did not constitute substantial gainful activity.

The court further disagrees with the ALJ's conclusion that Dr. Kadiyala's work restrictions were "not supported by treatment notes or a narrative." (R. 17) On the contrary, Dr. Kadiyala's treatment notes carefully follow Quee's course of treatment and recovery for her shoulder problems. The doctor gradually relaxed Quee's work restrictions as her condition improved, but the court finds it significant that Quee's treating physician found, in May 2003, that Quee had reached full recovery after her January 2003 shoulder surgery, yet the doctor continued to impose work restrictions that limited her to light-duty work, with significant musculoskeletal restrictions.

As the Eighth Circuit Court of Appeals has noted repeatedly, the appropriate inquiry is whether substantial evidence in the record as a whole supports the ALJ's findings that a claimant can perform "'the requisite physical acts day in and day out, in the sometime competitive and stressful conditions in which real people work in the real world.'" *Swope v. Barnhart*, ___ F.3d ___, ___, No. 05-1315, slip op., at 6 (8th Cir. Jan. 31, 2006) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)).  In the present case, the court finds the record does not contain substantial evidence to support the ALJ's conclusion that Quee had the residual functional capacity to meet this standard for the period from June 2002 through June 2003, and the court concludes Quee was disabled during that period of time.  The question then becomes whether Quee remained disabled after June 2003.

Quee argues the hypothetical questions posed by the ALJ to the VE "failed to consider or address the specific limitations imposed by Dr. Kadiyala, especially the limitations imposed in his final May 13, 2003 work restrictions." (*Id.*)  Quee notes that when the VE considered the work restrictions imposed by Dr. Kadiyala, the VE concluded Quee would be able to work less than full-time, either at her past work or at any other work.

While the determination of whether an individual is disabled is left for the Commissioner, and not for a treating or consulting physician, *see Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998), "the opinion of a treating physician is accorded special deference under the social security regulations," and should be granted "controlling weight" as long as the opinions are "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  The Commissioner argues Dr. Kadiyala only treated Quee for her shoulder problems, and he therefore was not qualified to offer an opinion regarding Quee's ability to sit, stand, walk, or work for any particular number of hours per week.

(*See* Doc. No. 8 at 10)  The court disagrees, in part.  The work restrictions imposed by Dr. Kadiyala primarily related to Quee's musculoskeletal systems – her ability to walk, stand, sit, lift, and use both of her arms, is directly related to the examinations performed by Dr. Kadiyala and the physical therapists's observations.  Those work restrictions are consistent with light-duty jobs, as stated in the work restrictions.

However, the court agrees with the Commissioner's argument that Dr. Kadiyala was not qualified to offer an opinion regarding Quee's capacity to work any particular number of hours per week.  The record contains extensive treatment notes regarding the medical management of Quee's ongoing conditions, and none of Quee's other treating physicians ever suggested she limit her working hours.  Furthermore, as the Commissioner points out, Quee, herself, testified she felt able to work full-time as long as she did not have to "stand over five or six hours of a day."  (R. 364)  Therefore, the ALJ posed proper hypothetical questions to the VE regarding Fair's ability to work after June 2003.

The court is impressed by the fact that despite her numerous medical problems, Quee continued to attempt to work throughout her period of disability.  She did not "give up" and seek public assistance after having surgery on both shoulders.  She alleges her period of disability began only when she was forced to have a second surgery on her right shoulder, she failed to recover completely, and in combination with her multiple other serious medical problems, she was unable to return to full-time employment.  The court finds, however, that Quee was able to return to full-time employment after June 2003.  As noted above, the court finds the ALJ failed to consider Quee's ability to work full-time for the period from June 19, 2002, through June 22, 2003, and the record contains substantial evidence that Quee was disabled during that period of time.

## V. CONCLUSION

For the reasons set forth above, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, that unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed in part and reversed in part, and this matter be remanded for calculation and award of benefits for the period from June 19, 2002, through June 22, 2003.[4]

**IT IS SO ORDERED.**

**DATED** this 14th day of February, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

[4]NOTE: If the district court adopts this recommendation and final judgment is entered for the plaintiff, the plaintiff's counsel must comply with the requirements of Local Rule 54.2(b) in connection with any application for attorney fees.